**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHERYL DENISE COOPER, | : | Case No. 3:12-CV-0342 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM DECISION** |
| | | **AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

Pursuant to 42 U. S. C. § 405(g), Plaintiff seeks judicial review of Defendant's final

determination denying her claims for Disability Insurance Benefits (DIB) under Title II of the Social

Security Act (Act) and for Supplemental Security Income (SSI) under Title XVI of the Act.  Pending

are the cross-Briefs of the Parties and Plaintiff's Reply (Docket Nos. 19, 20 & 21).  For the reasons

that follow, the Commissioner's decision is affirmed.

## I. PROCEDURAL BACKGROUND.

On February 23, 2009, Plaintiff filed applications for DIB and SSI alleging that she became

unable to work because of her disabling condition on September 1, 2005 (Docket No. 13, pp. 144-145;

146-147 of 939).  Plaintiff's requests were denied initially and upon reconsideration (Docket No. 13,

pp. 69-71, 72-74, 77-78, 79-81 of 939).  Plaintiff filed a timely request for hearing and on June 8,

2009, Administrative Law Judge (ALJ) Mary Gattuso held a hearing at which Plaintiff, represented

by counsel, and Vocational Expert (VE) Joseph L. Thompson attended and testified (Docket No. 13, pp. 34, 101-103 of 939).  On May 13, 2011, ALJ Gattuso issued an unfavorable decision (Docket No. 13, pp. 12-28 of 939).  On December 15, 2011, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner (Docket No. 13, pp. 5-7 of 939).  Plaintiff filed a timely Complaint in this Court seeking judicial review.

## II.  FACTUAL BACKGROUND.

A.  **PLAINTIFF'S TESTIMONY**.

Plaintiff was single and resided alone in an apartment.  She was a high school graduate and attended college for four years but failed to obtain a degree.  However, she was a licensed emergency medical technician (EMT) (Docket No. 13, pp. 39, 41, 42 of 939).

Plaintiff's rent was subsidized by Neighborhood Property Housing.  Her monthly income was supplemented with a stipend of $115 from Job and Family Services (Docket No. 13, pp. 42, 43, 46 of 939).

At the time of the hearing, Plaintiff was working part-time at Harbor Behavioral Healthcare (Harbor) as a counselor.  She was paid according to the number of persons counseled.  In 2008, Plaintiff was a student tutor.  She was compensated for assisting fellow students for six hours weekly. Plaintiff was employed in June 2006 for one month as an EMT.  Work as an EMT was strenuous and Plaintiff had difficulty lifting patients because of a "basketball injury" to her knees (Docket No. 13, pp. 40, 41, 53, 63 of 939).

Plaintiff testified that she had problems with her knees and back and also experienced symptoms of Multiple Sclerosis, including difficulty with balance.  She also had panic attacks that resulted from high levels of stress.  During the attacks, she exhibited various symptoms including

2

abnormal heart beats, abnormal breathing, cephalgia, a heavy chest and profuse sweating.  Dealing with the symptoms of depression was exhausting.  Plaintiff estimated that four times during a six-month period, she had a depressive episode that lasted from four days to four weeks.  During this time it was critical that Plaintiff avoid negative stimuli in her environment and attempt to motivate her mind to stop racing thoughts and stop absorbing negative images.  For these reasons, she watched television sparingly, read materials with a positive spin and listened to music (Docket No. 13, pp. 45, 52, 53, 54 of 939).

Plaintiff underwent psychological counseling with a therapist weekly or every other week and psychiatric treatment quarterly.  The treating psychiatrist had prescribed a regimen of Lexapro®, a medication used to treat anxiety and depression; Trazodone, an antidepressant; and Strattera®, a medication used to provide relief for attention deficit hyperactivity disorder (ADHD).  A side effect of these medications was chronic grogginess (Docket No. 13, pp. 47, 51 of 939; PHYSICIAN'S DESK REFERENCE, 2006 WL 368897, 3742502, www. drugs.com/trazodoe.html).

In 2010, Plaintiff underwent a neurological evaluation to determine whether she had multiple sclerosis (MS).  Since November 2010, Plaintiff had undergone three injections of a steroid in the rear of her head and neck for purposes of reducing the inflammation, pain and swelling around the occipital nerves (Docket No. 13, pp. 48, 49, 51 of 939).  Before the nerve blocks, Plaintiff had chronic headaches "all day long" that on an ascending scale of one to ten, measured eight.  Plaintiff admitted that the nerve blocks had prevented headaches (Docket No. 13, p. 54 of 939).  Continued nerve blocks were part of her treatment plan primarily to control headaches and neck pain (Docket No. 13, p. 56 of 939).

Diagnosed with an irritable bowel syndrome, Plaintiff had undergone a bowel resection in

3

April 2008.  Plaintiff suffered from severe post-surgery difficulties which required several hospital stays.  Now she could not control her bowels and she recalled several embarrassing moments during which she lost control of her bowels (Docket No. 13, pp. 54, 61, 62 of 939).  Notably, the nerve blocks appeared to loosen her stool.  Plaintiff had been referred to a gastroenterologist for evaluation (Docket No. 13, pp. 55, 56 of 939).

Even with these impairments, Plaintiff estimated that she could stand for fifteen minutes at a time, she could walk one quarter of mile before she had to rest and she could sit for one hour.  Sitting over one hour precipitated cramping, bathroom and bowel issues (Docket No. 13, pp. 43, 45, 46 of 939).  Plaintiff used her car to drive to work and during the winter season she drove to church  which was located across the street from her residence.  Plaintiff exercised considerably in the summer, often walking to her destination.  Although she had recently visited her mother in Kentucky, Plaintiff rarely traveled out of town because she could not afford to do so.  During her leisure time, Plaintiff listened to music and watched television (Docket No. 13, pp. 44, 45 of 939).

        **B.**     **VE TESTIMONY**.

Averring that his testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), the VE categorized Plaintiff's past and current work as follows:

| JOB | PHYSICAL EXERTION LEVELS | SKILL LEVEL |
| --- | --- | --- |
| Chemist | **Light** work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, a good deal of walking or standing,  when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C. F. R. § 220.132(b). | **Skilled**–work that requires qualifications in which the person uses judgment to determine the machine and manual operations to be performed to obtain the proper form, quality and quantity of matter to be purchased. 20 C. F. R. § 404.1568(c); 416.968(c). |

4

| EMT | **Very heavy** work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. 20 C. F. R. § 220.132(e). | **Skilled** |
|---|---|---|
| **Instructional Aide** | **Light** | **Semi-skilled**–work which needs some skills but does not require doing the more complex work duties. 20 C. F. R. § 404.1568(b); 416.968(b). |
| **Technical Support** | **Sedentary** work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; a certain amount of walking and standing occasionally is often necessary in carrying out job duties. 20 C. F. R. § 220.132(a). | **Skilled** |
| **Waitress** | **Light** | **Semi-skilled** |
| **Counselor** | **Light** | **Semi-skilled.** |

(Docket No. 13, p. 59 of 939).

In the first hypothetical question, the ALJ proposed that the VE consider a claimant of Plaintiff's age, educational background and work experience, limited to performing light work as defined in the [social security] regulations, and unskilled work but only doing occasional posturing limitations. The VE responded that all of the past work highlighted in the table above, would be eliminated from the pool of work that the hypothetical claimant could perform due to the skill level. In the alternative, there were three jobs that this hypothetical claimant could perform in the light, unskilled occupational base and the number of positions are as follows:

| JOB/DOT | NUMBER OF JOBS |
|---|---|
| Food Preparation/311.677-010 | 10,000 statewide 300,000 nationally |
| Cashier/211.462-010 | 40,000 statewide 1.2 million nationally |
| Folder/369.687-018 | 4,000 statewide 120,000 nationally |

(Docket No. 9, pp. 59, 60 of 939).

5

The VE proceeded to explain that the absenteeism norm is consistent with one or two days per month, such that if a person is consistently absent at that level or above, employment would be eliminated. Break periods, typically scheduled in the morning and afternoon, were fifteen minutes in duration and a thirty minute lunch break is provided. There is generally an allowance for one or two times per eight-hour shift for a break of up to fifteen minutes on an unscheduled basis. Any breaks that would exceed this amount because of symptoms and other issues, would, too, terminate employment (Docket No. 13, pp. 59, 60 of 939). For instance if an employee had a panic attack that resulted in either absenteeism or time away from the workstation that exceeded the normal break periods, employment would also be eliminated (Docket No. 13, pp. 59, 60 of 939).

### III. MEDICAL EVIDENCE.

The cornerstone for the determination of disability under both Title II and Title XVI is the medical evidence. Each person who files a disability claim is responsible for providing medical evidence from sources who have treated or evaluated the claimant, determined that the impairment exists and assessed the severity of that impairment. 20 C.F.R. § 404.1512((b), (c) (Thomson Reuters 2012). A chronological review of those sources who treated or evaluated Plaintiff follows.

Admitted to St. Vincent Mercy Medical Center on October 9, 2006, Plaintiff was treated for a major depressive affective disorder, recurrent episode. Plaintiff responded well to a regimen of antidepressants, individual supportive therapy and hospital milieu. Plaintiff's condition stabilized and she was discharged on October 16, 2006 (Docket No. 13, pp. 216-232 of 939).

Ongoing psychiatric treatment was provided by Harbor staff psychiatrist, Dr. Souhaila Solaiman, who supervised with Michele Prephan, a psychiatric nurse; Monica Wilkins, a licensed practical nurse; Julia Roberts, a clinician; and Deepa Dasani, a professional counselor, in the management of Plaintiff's care. Ms. Dasani conducted the initial diagnostic assessment on October

6

26, 2006. She diagnosed Plaintiff with:

1. A major depressive disorder, recurrent and moderate;
2. A dysthymic disorder; and
3. Hyperthyroidism.

Ms. Dasani attributed to Plaintiff a Global Assessment of Functioning (GAF) score of 60. This numeric score used by mental health clinicians to rate how well an adult meets the social, occupational and psychological functioning, denotes moderate symptoms or moderate difficulty in social, occupational or school functioning. Ms. Dasani suggested that Plaintiff had a one year history of a GAF at 60 or less and that her score would remain at 60 for at least one year (Docket No. 13, pp. 238-242 of 939; Www.psyweb.com/DSM_IV/jsp/Axis_V.jsp.).

After the initial evaluation, Dr. Solaiman started Plaintiff on a regimen that was designed to control and resolve symptoms of anxiety and major depressive disorders. To that end, on November 8, 2006 and December 1, 2006, samples of Lexapro® were dispensed; on January 3, 2007, it was recommended that Plaintiff engage in group therapy and continue taking Lexapro®; on March 7, 2007, samples of Lexapro® were dispensed; and on March 26, 2007, the prescription for Lexapro® was continued. Plaintiff's mood was improved even though she was experiencing pain (Docket No. 13, pp. 285-286; 287; 291; 292-294; 295-297 of 939).

On January 26, 2007, Plaintiff commenced individual therapeutic counseling. Twice monthly, Plaintiff shared her issues and how she coped and managed her symptoms with Ms. Dasani or Ms. Roberts. Most of the individual sessions were focused on keeping Plaintiff positive and hopeful. The clinicians noted generally that there was direct correlation to how Plaintiff progressed with the significant events or changes in her life cycles. Plaintiff's mood was generally cooperative but there were some periods that she was clearly depressed. Through October 3, 2007, Plaintiff showed some improvement in coping with depression; on October 9, 2007, Plaintiff showed some frustration with

7

her health issues; and on October 18, 2007, there were indicators that Plaintiff had encountered a period of deterioration (Docket No. 13, pp. 772; 776-827; 828-843 of 939).

In the meantime, blood samples collected on March 29, 2007, showed an elevated white blood count and the red blood cell distribution width (Docket No. 13, p. 534 of 939).

On April 18, 2007, Dr. Jennica Ng, M. D., a resident at the Toledo Hospital, performed a consultative examination to assess the abdominal pain in light of the hysterectomy that had been performed on April 10, 2007. Dr. Ng determined that Plaintiff's abdominal pain was secondary to bowel obstruction versus partial small bowel obstruction and there was the presence of deep venous thrombosis and gastrointestinal prophylaxis (prevention of disease or of a process that can lead to disease). The computed tomography (CT) scan of Plaintiff's abdomen showed small bands of atelectasis (decreased or absent air in the entire or part of the lung or loss of lung volume) in the left lower lobe and mild posterior and lateral right basilar atelectasis with some minimal consolidation (Docket No. 13, pp. 509-519; 521-531 of 939; STEDMAN'S MEDICAL DICTIONARY 199580, 334880, 36120 (27th ed. 2000)).

Dr. Solaiman conducted a medication review on May 2, 2007, during which Plaintiff shared that she suffered urinary incontinence during her sleep. A sleep aid was recommended for occasional sleeplessness (Docket No. 13, p. 284 of 939).

Dr. Kari M. Stauffer-Vrzal, M. D, a family practitioner, conducted a post-hospital followup on May 10, 2007 and her concerns involved some esophageal and gastric problems as well as trauma in the throat region. Thereafter on June 11, 2007, Dr. Stauffer-Vrzal diagnosed Plaintiff with gastroesophageal reflux disease (GERD), back pain and an allergy since it appeared that the back pain was more musculoskeletal in origin. She prescribed Flexeril®, a medication designed to relieve skeletal muscle spasm without interfering with muscle function (Docket No. 13, pp. 505, 508 of 939;

PHYSICIAN'S DESK REFERENCE, 2006 WL 272509 (2006)).

At Harbor on June 13, 2007, Ms. Prephan reviewed Plaintiff's medication plan.  It was her opinion that Plaintiff had moderate symptoms or moderate difficulty in social, occupational or school functioning (Docket No. 13, pp. 281-283 of 939).

On June 18, 2007, Dr. Stauffer-Vrzal examined Plaintiff for foot pain which had persisted for three to four days.  A total of three images of the right foot showed no evidence of fracture. (Docket No. 13, p. 502-504 of 939).

Blood samples collected on July 7, 2007, July 10, 2007 and July 11, 2007, all showed no evidence of blood in Plaintiff's stool (Docket No. 13, pp. 602-605 of 939).

From July 11, 2007 through February 27, 2008, Dr. Solaiman reviewed Plaintiff's intake of medication at least once monthly.  There were no side effects or complications from the prescribed dosages (Docket No. 13, pp. 264-266; 267-269; 270-272; 273-275; 276-278; 279; 280 of 939).

The results were negative from the test for hidden blood in the stools that was administered on July 13, 2007 (Docket No. 13, p. 604 of 939).

On July 19, 2007, Dr. Lynette M. Thuma, M. D., determined that Plaintiff had an iron deficiency anemia.  Plaintiff was placed on a program during which her iron panel would be assessed quarterly.  Results from the radiological examination of Plaintiff's lumbar spine showed mild degenerative changes at L5-S1 (Docket No. 13, pp. 602-603 of 939).

Dr. Shelly K. Mills, D. O, a family practitioner, ordered osteopathic manipulative treatment with a physical therapist beginning on October 5, 2007, the objective of which was to address sciatic pain and numbness in the right hip.  Plaintiff participated in the implementation of a therapy plan that included therapeutic activity supplemented by aquatic therapy, electrical stimulation and superficial

heat/ice (Docket No. 13, pp. 597-601 of 939).

Plaintiff underwent a magnetic resonance imaging test (MRI) of the thoracic and lumbar spine on October 19, 2007.  The MRI results of the lumbar spine were normal.  There was potential right cystic abnormality that was subject to further study.  No canal or foraminal stenosis of the vertebral body abnormalities of the thoracic spine were identified (Docket No. 13, pp. 595-596 of 939).

On December 13, 2007, Dr. Mills ordered a MRI study of the pelvic mass and an ultrasound to rule out hyperthyroidism (Docket No. 13, p. 594 of 939).

From January 16, 2008 through February 11, 2008, Plaintiff made no clinical progress toward her goals during therapy with Ms. Dasani or Ms. Roberts; however, on February 20, 2008, Plaintiff started showing improvement in coping better with her symptoms.  The progress leveled out and on March 26, 2008, she expressed feelings of anxiety in anticipation of surgery and she was feeling frustrated because her health issues interfered with her ability to sustain employment.  She was "making some improvement" on April 24, 2009 (Docket No. 13, pp. 776-843 of 939).

On January 16, 2008, Dr. Mills ordered a refill of iron pills pending the results from an iron study.  She also continued the medication designed to control the thyroid.  She recommended a follow-up examination with Plaintiff's obstetrics and gynaecologist to determine if the pelvic mass had ruptured or was enlarged (Docket No. 13, p. 589 of 939).  On February 25, 2008, Dr. Mills interpreted the results from the pelvic ultrasound study to mean that the solid appearing rather large size left ovarian mass lesion had increased in size and there was a small amount of adjacent fluid (Docket No. 13, p. 587 of 939).

Plaintiff underwent an electrocardiogram and a chest X-ray on April 4, 2008.  The sinus rhythm was normal; however, there was a left axis deviation from normal and other nonspecific

10

anterior abnormalities.  The chest X-ray was normal (Docket No. 13, pp. 475-478 of 939).

In preparation for surgery, Plaintiff underwent an electrocardiogram.  Upon seeing the abnormal results, Dr. Mills ordered a stress test.  The results from the test administered on April 9, 2008, showed normal sinus rhythm and was within normal limits.  There was no chest pain and there were no ischemic changes or arrhythmias (Docket No. 13, pp. 468-473 of 939).

Dr. Solaiman reviewed Plaintiff's medication regimen on April 30, 2008.  There were no side effects or complications from medications; therefore,  they were continued (Docket No. 13, pp. 261-263 of 939).

At Toledo Hospital, Plaintiff underwent resection surgery to remove a diseased part of the small bowel on May 8, 2008 (Docket No. 13, pp. 356, 450-453; 454- 459 of 939).  Shortly after her discharge on May 15, 2008, Plaintiff presented to the THEC with abdominal pain and nausea.  Dr. Brian Kaminski, D. O., determined that the pain was from a small bowel obstruction.  Admitted again to the hospital, Plaintiff underwent several tests which resulted in the following:

| | | | |
|---|---|---|---|
| 1. | May 17 | Focused Ultrasound | Mild bulge in the gallbladder and no evidence of acute inflammation of the gall bladder or the presence of formation of gall stones. |
| 2. | May 17 | X-rays | Air filled somewhat distended loops of small bowel suggesting bowel obstruction. |
| 3. | May 18 | CT scan | Small pocket of fluid, mildly dilated loops of the abdomen mid and distal small bowels, mild sigmoid colon diverticula lesions on the intestine. |
| 4. | May 18 | CT scan | Small left ovarian cyst, gallbladder is distended and mild failure of the lung to fully expand. |
| 5. | May 22 | Ultrasound of right quadrant | Negative for acute inflammation of the gall bladder. |

(Docket No. 13, pp. 420-449 of 939; STEDMAN'S MEDICAL DICTIONARY 117660, 36120 (27th ed. 2000)).

11

Dr. Gregory J. Cerilli, M. D., performed a follow-up examination after the small bowel resection on June 3, 2008.  The abdomen was soft and the incision was well healed.  There were no signs of hernias or other problems (Docket No. 13, p. 579 of 939).

Dr. Mills conducted another follow-up evaluation on June 12, 2008.  Suspecting some iron deficiency, she continued the prescription for an iron supplement.  At the same time, she continued medication to control Plaintiff's asthmatic symptoms (Docket No. 13, p. 575 of 939).

On June 25, 2008, Dr. Solaiman reviewed Plaintiff's medication for side effects and complications.  Plaintiff reported none (Docket No. 13, pp. 258-260 of 939).

On July 8, 2008, Plaintiff underwent a consultative examination at Northwest Ohio Gastroenterology Associates (NOGA).  The nurse practitioner suggested that Plaintiff should undergo a small bowel series, eventually an esophagogastroduodenoscopy (EGD) and a duodenal biopsy (Docket No. 13, pp. 631-632 of 939).

The CT study conducted on July 16, 2008, showed mid-pelvic inflammatory stranding but this was improved compared to the study conducted on May 18, 2008.  The radiologist suspected the likelihood of a cystic structure within the left aspect of the pelvis (Docket No. 13, p. 619 of 939).

During her stay at Toledo Hospital which commenced on July 16, 2008, several medical residents, including Dr. Helen J. Rice, D.O. and Dr. Ann Steck, M. D., attempted to resolve the issues arising from intractable (obstinate) vomiting and diarrhea.  Several tests were administered:

| | | | |
|---|---|---|---|
| 1. | July 16 | Chest X-ray | Negative |
| 2. | July 16 | Abdominal X-ray | Negative |
| 3. | July 16 | Electrocardiogram | ? |
| 4. | July 17 | EGD | Normal |
| 5. | July 17 | Gallbladder ultrasound | Trace sludge |
| 6. | July 17 | Abdominal CT | Stranding with pelvic mesentery |
| 7. | July 18 | Pelvic CT | Within normal limits |

12

(Docket No. 13, pp. 376-416 of 939; STEDMAN'S MEDICAL DICTIONARY 207960 (27th ed. 2000)).

Plaintiff underwent another consultation at NOGA on August 8, 2008, after which the nurse practitioner opined that the small bowel follow-through had no abnormalities except for the stranding in the mesenteric region.  She suggested that stool samples be obtained to rule out an infectious cause for any abnormalities in the bowel pattern (Docket No. 13, pp. 628-629 of 939).

On August 13, 2008, Dr. Solaiman conducted a review of the medications Plaintiff was taking.  Again, Plaintiff did not complain of side effects or complications from the medication regimen (Docket No. 13, pp. 255-257 of 939).

Plaintiff presented to the Toledo Hospital Emergency Center (THEC) on August 14, 2008, with complaints of abdominal pain with nausea and vomiting.  She was admitted to the hospital pending confirmation of a small bowel obstruction versus ileus, versus gastroenteritis.  Treatment included re-hydration and bowel rest (no food or drink by mouth).  The small bowel loop in the lower pelvis was filled with stool and distended up to 3.1 centimeters.  Results from the four views of the abdomen were unremarkable when compared with results from the study dated July 18, 2008.  The results from the upper gastrointestinal series were normal (Docket No. 13, pp. 349-359, 362, 641. 642-649; 657-659 of 939).

On September 9, 2008, Plaintiff presented to the THEC with nausea and vomiting.  The CT scan of Plaintiff's abdomen showed increased fecalization of small bowel contents proximal to ileostomy site with a small amount of fluid (Docket No. 13, pp. 654-655; 936-937 of 939).

Comparing the views of the abdomen taken on September 10, 2008 with those of August 14, 2008, there was a fair amount of stool in Plaintiff's colon with no free air or obstruction (Docket No.

13

13, p. 934 of 939).

The X-rays of Plaintiff's abdomen were negative for bowel gases and her lung bases appeared clear on September 11, 2008 (Docket No. 13, p. 935 of 939)

Plaintiff underwent treatment for recurrent abdominal pain on September 20, 2008.  Dr. Mills increased the dosage of medication prescribed to control hypertension and she prescribed Mobic®, a non-steroidal anti-inflammatory drug used to treat pain, to control abdominal pain (Docket No. 13, pp. 233-234 of 939; PHYSICIAN DESK REFERENCE, 2006 WL 361120 (2006).

On September 9, 2008, Dr. Scott Ross, M. D., a resident, under the supervision of Dr. Brian Kaminski, D.O., treated Plaintiff at THEC for abdominal pain and vomiting of non-specified etiology. The laboratory evaluations of the abdomen and pelvis revealed increased fecalization of the small bowel but no small bowel obstruction (Docket No. 13, pp. 321-324 of 939).

Dr. Jeffrey R. Lewis ordered a complete abdominal examination.  On September 10, 2008, a fair amount of stool was in the colon with no free amount of air or obstruction.  On September 11, the bowel gas pattern was nonspecific and non-obstructive (Docket No. 13, pp. 330, 335-344 of 939).

On September 17, 2008, Plaintiff presented to the THEC with abdominal pain.  Dr. Porsche Beetham, D. O., controlled Plaintiff's pain with morphine and Zofran®.  Phenergan was prescribed to control nausea and vomiting (Docket No. 13, p. 918 of 939).

Dr. Solaiman determined on September 24, 2008 and November 5, 2008 that Plaintiff was medication compliant.  During both sessions, Plaintiff reported no side effects or complications from medications (Docket No. 13, pp. 249-251; 252-254 of 939).

Dr. Mills addressed issues related to Plaintiff for asthma, urinary respiratory infection and hypertension on January 20, 2009 (Docket No. 13, p. 916 of 939).

14

On January 31, 2009, Plaintiff was treated at the THEC for rectal bleeding.  The bleeding was attributed to constipation (Docket No. 13, pp. 314-317 of 939).

Plaintiff presented to Dr. Jill Rice, D.O., on February 6, 2009 for gastrointestinal and bowel problems which had apparently resulted in constipation.  Dr. Rice recommended that Plaintiff use a stool softener, change her diet and increase her fluid intake (Docket No. 13, p. 915 of 939).

Dr. Peter F. Klein, M. D., performed a total colonoscopy on February 18, 2009.  No tumors, polyps or inflammation were identified (Docket No. 13, pp. 313 of 939).

Dr. Solaiman continued the medication regimen on March 4, 2009 (Docket No. 13, pp. 243-245 of 939).

On March 10, 2009, Plaintiff was treated at the THEC for complaints of abdominal pain.  She was diagnosed with gastritis and a viral illness for which a nausea medication was dispensed (Docket No. 13, pp. 303-305 of 939).  However, the radiographic views of the abdomen and pelvis showed an unremarkable bowel gas pattern, no obstruction, ileus or free air (Docket No. 13, p. 912 of 939).

Plaintiff returned to the THEC on March 11, 2009 for treatment of intractable vomiting.  She was diagnosed with possible gastroparesis (weakness of the gastric peristalsis, which results in delayed emptying of the bowels).  Anti-nausea medication and medication used to prevent vomiting were dispensed (Docket No. 13, pp. 298-302 of 939; STEDMAN'S MEDICAL DICTIONARY 159620 (27th ed. 2000)).

On March 20, 2009, Dr. Hossein Behnjaye, M. D., advised that Plaintiff's status post emergency room dehydration and nausea and vomiting had improved.  Plaintiff's symptoms were associated with stomach flu and low amounts of potassium in the blood were also improving (Docket No. 13, p. 908 of 939).

15

Dr. Mills opined on March 31, 2009, that Plaintiff's hypertension was controlled, her low potassium counts had been resolved and her asthma attacks were controlled with an inhaler. She was advised to continue her medications (Docket No. 13, p. 906 of 939).

Dr. Abigal Dowling, M. D., treated Plaintiff for nausea and vomiting that had persisted for three days. Diagnosing Plaintiff with viral gastroenteritis versus gastritis, Dr. Dowling prescribed suppositories for nausea and medication to control vomiting (Docket No. 13, p. 910 of 939).

Dr. Solaiman saw Plaintiff on April 29, 2009, and she opined that Plaintiff was oriented as to time and place, her memory was intact as was her concentration, she denied suicidal ideations or hallucinations, and her cognitive functions appeared to be at baseline without existing deficits. Dr. Solaiman attributed a GAF of 60 or a score that denotes moderate symptoms or moderate difficulty in social, occupational or school functioning (Docket No. 13, pp. 773-774 of 939).

From May 7, 2009, Plaintiff maintained her individual counseling sessions with Ms. Dasani or Ms. Roberts, focusing on decreasing her anxiety by relaxation and increasing self-esteem. Plaintiff's progress was akin to a roller coaster ride–sometimes she expressed feelings of frustration and other times, she was encouraged and had a positive outlook (Docket No. 13, pp. 708-711; 715-718; 722-728 of 939).

Dr. Karen Terry, Ph. D., completed the PSYCHIATRIC REVIEW TECHNIQUE form on May 15, 2009 for a period of September 1, 2005 to May 15, 2009. In her opinion, Plaintiff had two medically determinable impairments that did not satisfy the diagnostic criteria, specifically, a dysthymic disorder and a major depressive disorder, recurrent and moderate. There was insufficient evidence to ascertain the degree of limitation, if any, Plaintiff had in her functional limitations (Docket No. 13, pp. 480-492 of 939).

16

A certified nurse practitioner, Meredith Walters, prescribed an antibiotic for treatment of sinusitis on June 1, 2009 (Docket No 13, p. 905 of 939).  On June 9, 2009, Plaintiff presented with right leg pain and numbness.  Ms. Walters obtained a hip and lumbosacral spine film, ordered a prednisone taper and recommended some thigh exercises to assist with pain relief (Docket No. 13, p. 901 of 939).

On June 9, 2009, Dr. Steven E. Shekut, M. D., a radiologist, compared the radiological examination of Plaintiff's lumbar spine and right hips to examinations conducted on July 19, 2007. Subtle degenerative changes of the hips, greater on the right, were detected.  There were early degenerative changes at L5-S1 with subtle facet joint (Docket No. 13, p. 903 of 939).

On June 16, 2009, Dr. Mills suggested that Plaintiff obtain a biopsy of a left arm lesion.  In addition, she ordered a chest X-ray because Plaintiff had a cough and was congested (Docket No. 13, p. 899 of 939).  Dr. Mills refilled Plaintiff's prescriptions given to maintain her asthma and control the pain attributed to right hip osteoarthritis (Docket No. 13, p. 897 of 939).

Plaintiff presented to Dr. Mills on July 30, 2009 to discuss the results from her pulmonary function test.  It was confirmed that Plaintiff had asthma but she elected to discontinue use of the Albuterol inhaler for therapy and "not to progress on to any further management" (Docket No. 13, p. 892 of 939). On October 29, 2009, Dr. Mills noted that Plaintiff's asthma appeared well controlled (Docket No. 13, p. 891 of 939).  On December 4, 2009, Dr. Mills opined that Plaintiff's vertigo was most likely benign so she ordered conservative treatment, adding an antihistamine used to manage nausea and vomiting and an antibiotic for the symptoms of sinusitis.  By December 11, 2009, the vertigo and sinusitis had been resolved (Docket No. 13, pp. 886, 887 of 939).  The CT scan of the brain taken on December 15, 2009, was normal, thus confirming that the vertigo was resolved

17

(Docket No. 13, p. 885 of 939).

On February 5, 2010, Dr. Joy L. Barnes, M.D., attributed Plaintiff's likely tension headache to sinusitis (Docket No. 13, p. 883 of 939).

At Toledo Hospital on February 10, 2010, seven images of cervical spine were obtained.  The results were negative for abnormality (Docket No. 13, p. 884 of 939).

Plaintiff's stool sample collected on February 26, 2010, was negative for occult blood (Docket No. 13, p. 879 of 939).

Results from the rapid streptococcus test was negative on March 10, 2010 (Docket No. 13, p. 877 of 939).

Plaintiff's white blood count was elevated in the samples collected on March 16, 2010 (Docket No. 13, p. 872 of 939).  Dr. Mills noted that Plaintiff was suffering from an iron deficiency anemia, fatigue and a low platelet count (Docket No. 13, p. 869 of 939).

On May 7, 2010, Dr. Mills noted that in previous laboratory work, Plaintiff had a low platelet count.  She planned to obtain a complete blood count (Docket No. 13, p. 867 of 939).

Ms. Dasani noted on July 15, 2010, that Plaintiff reported doing well and was adjusting to a work schedule.  Plaintiff was referred for further evaluation and continued care through the Zepf Community Mental Health Center (Zepf) (Docket No. 13, p. 664 of 939).

Dr. Solaiman conducted a medication management review on July 28, 2010.  Plaintiff was oriented in time and place, her memory was intact and her cognitive functions appeared to be at baseline without existing deficits (Docket No. 13, pp. 662-663 of 939).

Plaintiff underwent an adult diagnostic assessment at Zepf on August 3, 2010.  She was diagnosed with a major depressive disorder, recurrent, in partial remission, a dysthymic disorder,

18

ADHD and moderate symptoms or moderate difficulty in social, occupational or school functioning (Docket No. 13, pp. 737-745 of 939).

Dr. Elizabeth A. Ford, M. D., noted on August 13, 2010, that Plaintiff had subacute asthma exacerbation.  An inhaled steroid was prescribed and Plaintiff was instructed to use Ibuprofen 800 milligrams for cervical muscle pain (Docket No. 13, p. 866 of 939).

The MRI of Plaintiff's brain, administered on August 23, 2010, showed the presence of diffuse white matter hyperintensities.  At that juncture, Dr. Ford could not rule out multiple sclerosis (MS) (Docket No. 13, p. 864 of 939).

Plaintiff underwent a psychiatric history and evaluation at Zepf on August 26, 2010.  Dr. Susan Haley, M. D., conducted a historical evaluation and continued Plaintiff's medication needs (Docket No. 13, pp. 731-733 of 939).

Dr. Ford addressed Plaintiff's serious inflammation of the middle ear on August 27, 2010. She continued to suspect that Plaintiff had MS and referred her to a neurologist.  The asthma exacerbation appeared to be resolved and blood tests were ordered to determine the presence of an elevated white blood cell count and a low platelet count (Docket No. 13, p. 863 of 939).

On September 3, 2010, Plaintiff was evaluated for management of her care under the Unison Health Plan.  The primary request for treatment was for the symptoms of vertigo (Docket No. 13, pp. 860-862 of 939).

On September 29, 2010, Plaintiff underwent a vision examination after which Plaintiff was advised to follow-up with a neurologist.  Dr. Michael Cooper, O. D., diagnosed Plaintiff with a field defect, contraction, generalized (Docket No. 13, pp. 765-766 of 939).

The final diagnostic imaging report taken on September 30, 2010, at the Toledo Hospital,

19

showed some nonspecific linear parenchymal scarring within the upper lobe of the left lung; otherwise, Plaintiff's lungs were clear and there was no pleural effusion or abnormal collection of gas or air in the pleural space (Docket No. 13, p. 855 of 939).

It is noteworthy that Dr. Ford found a latent tuberculosis (TB) infection based on positive purified protein testing.  On October 20, 2010, she commented that a neurologist suspected that Plaintiff had MS; however, the neurologist conducted a neurodiagnostic evaluation and the responses were within normal limits (Docket No. 13, pp. 759-761; 854 of 939).

On October 21, 2010, Plaintiff discussed the stressors, including her medical issues, with Dr. Haley who continued the psychiatric medication and discussed the attendant side effects (Docket No. 13, pp. 730-731, 732-734 of 939).

Dr. Faizan Hafeez, M. D., of the Neurology and Headache Clinic (NHC), determined that Plaintiff had migraine headaches without aura on October 23, 2010.  He noted improved frequency and intensity with the present medication.  Dr. Hafeez suspected MS based on the MRI findings from October 20, 2010.  Later on November 1, 2010 and January 10, 2011, Dr. Hafeez administered a greater occipital nerve block, bilaterally, and trigger point injections (Docket No. 13, pp. 746, 751 of 939).  On November 4, 2010, Dr. Hafeez compared the MRI of Plaintiff's brain taken on August 23, 2010.  The results showed no interval changes (Docket No. 13, pp. 754-755; 757-758l 760-762 of 939).

The MRI of the brain taken on November 4, 2010, showed no interval change.  MS could appear this way as well as small vessel ischemic changes (Docket No. 13, pp. 754-756 of 939).

On November 8, 2010, Dr. Ford noted that Plaintiff's hypertension was well controlled on the current medication, she had bladder incontinence, she had mild intermittent asthma and latent TB

20

(Docket No. 13, p. 850 of 939).

On December 10, 2010, Dr. Ford noted that, *inter alia*, Plaintiff had a latent TB infection, her hypertension was well controlled, and she had dark stools (Docket No. 13, p. 846 of 939).

On March 24, 2011, Dr. Haley, M. D., completed a "MEDICAL SOURCE STATEMENT CONCERNING THE NATURE AND SEVERITY OF AN INDIVIDUAL'S MENTAL IMPAIRMENT," in which the answers specifically reflect what "Plaintiff reported to her."  In particular, Plaintiff reported that she had marked limitation in her ability to maintain attention and concentration for two hour periods at a time while she had moderate limitation in her ability to remember, understand and follow simple instructions, keep a regular work schedule and maintain punctual attendance; and interact appropriately with others (Docket No. 13, pp. 938-939 of 939).

### IV.  STEPS TO SHOWING ENTITLEMENT TO SOCIAL SECURITY BENEFITS.

DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); See also 20 C.F.R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).  The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively.  To assist clarity, the remainder of this decision refers only to the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first

21

demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time her or she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6ᵗʰ Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits the claimant's physical or mental ability to do basic work activities. *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6ᵗʰ Cir. 2001) (internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V. THE ALJ'S FINDINGS.

Upon consideration of the evidence, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Act through December 31, 2010. Plaintiff had not engaged in substantial gainful activity since September 1, 2005, the alleged onset date of her impairment.

2. Plaintiff had the following severe impairments: abdominal pain, GERD, asthma, hypertension, hypothyroidism, major depressive disorder, dysthymic disorder, and ADHD. Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

3.      Plaintiff had the residual functional capacity to perform light work as defined in 20 C. F. R. § 404.1567(b) and 416.967(b); however, Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; Plaintiff could stand and walk a total of six hours out of an eight-hour workday and she could sit for two hours out of an eight-hour workday; and she could occasionally stoop, crouch, kneel, crawl and climb ramps and stairs but never balance or climb ladders, ropes or scaffolds.  Plaintiff could perform unskilled work.

4.      Plaintiff was unable to perform her past relevant work.  Considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

5.      Plaintiff had not been under a disability as defined in the Act from September 1, 2005 through the date of the decision or May 13, 2011.

(Docket No. 13, pp. 15-28 of 939).

## VI.  STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision of the Commissioner.  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

**VII. DISCUSSION**.

Plaintiff argues that:

1.  The ALJ's analysis of the treating physician opinions is flawed.
2.  The ALJ's assessment of her residual functional capacity is not supported by substantial evidence.

Defendant responded:

1.  There is substantial evidence supporting the weight given the medical source opinions.
2.  There is substantial evidence supporting the ALJ's finding that a significant number of jobs accommodate Plaintiff's functional capacity and vocational profile.

**1.    THE WEIGHT GIVEN TO THE TREATING PSYCHIATRIST**.

Plaintiff argues that the only opinion evidence in the record that related to her mental impairments was provided by Dr. Haley. The ALJ erred by failing to give controlling weight to Dr. Haley's opinions including her finding that Plaintiff was an unlikely candidate for successful

24

employment and her observations based on the clinical signs.

      **a.**      **THE TREATING SOURCE STANDARD.**

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. *McCombs v. Commissioner of Social Security,* 2010 WL 3860574, *6 (S. D. Ohio) (*citing* 20 C.F.R. §§ 404.1527(d), 416.927(d)). The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of the claimant's impairment(s), including symptoms, diagnosis and prognosis, what the claimant can still do despite impairment(s), and the claimant's physical or mental restrictions." *Id.* (*citing* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)). Some opinions, such as those from examining and treating physicians, are normally entitled to greater weight. *Id.* (*citing* 20 C.F.R. §§ 404.1527(d), 416.927(d)).

To qualify as a treating source, the acceptable medical source must have examined the claimant and engaged in an ongoing treatment relationship with the claimant consistent with accepted medical practices. *Id.* (*citing Smith v. Commissioner of Social Security,* 482 F.3d 873, 875 (6th Cir. 2007) (*quoting* 20 C.F.R. § 404.1502)). The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances. *Cross v. Commissioner of Social Security*, 373 F. Supp.2d 724, 729 -730 (N. D. Ohio 2005). More weight is attributed to treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic

25

techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. *Id.* (*citing* 20 C. F. R. § 404. 1527(d)(2)).

      **b**.      **DR. HALEY'S OPINIONS AS A WHOLE**.

Plaintiff's argument that Dr. Haley's opinions are entitled to controlling weight is contradictory to the rules. Although Dr. Haley was a treating source, she did not see Plaintiff with enough frequency that she could provide a longitudinal picture of Plaintiff's impairment, including symptoms, diagnosis and prognosis. Her treatment notes show that Plaintiff had office visits on August 26, 2010 and October 21, 2010. Dr. Haley appeared to adopt the diagnosis and prognosis of Plaintiff's impairment and never deviated from the findings by other physicians who had treated Plaintiff. In fact the treatment notes from Plaintiff's visits show that Dr. Haley followed the course of treatment implemented by physicians that preceded her. Missing from the medical records and treatment notes is diagnostic or clinical evidence that reflects Dr. Haley's judgments about the nature and severity of the Plaintiff's impairment.

The ALJ acknowledged the benefit of considering Dr. Haley's observations in the MEDICAL SOURCE STATEMENT. Specifically, the ALJ considered that Dr. Haley's determinations that Plaintiff had a marked limitation in her inability to maintain attention and concentration and that she had a moderate inability to understand, remember and follow simple directions; however, these conclusions were not based upon Dr. Haley's observations or diagnoses. Every declaration of marked or moderate functional limitations made by Dr. Haley in the Statement is preceded by a disclaimer that the "patient reports," an indication that any conclusions drawn were based solely on Plaintiff's subjective analysis of her situation. Accordingly, Dr. Haley's decision that Plaintiff would be markedly limited in her ability to maintain attention and concentration or that Plaintiff had difficulty

26

focusing was Plaintiff's assessment of her symptoms and their affect on her functioning.  Dr. Haley provides nothing by way of corroboration for these opinions.

The ALJ appropriately concluded that although Dr. Haley was a treating source, her opinions were only entitled to limited weight (Docket No. 13, p. 25 of 939).  Not only did the ALJ do what the regulations required, her decision is supported by Dr. Haley's records.

      **c.**      **DR. HALEY'S DISABILITY CONCLUSION.**

Plaintiff suggests that the ALJ's analysis falls short because she did not adopt Dr. Haley's conclusion that Plaintiff would be "an unlikely candidate for successful employment."

In evaluating a claimant's alleged disability, medical opinions and diagnoses of treating physicians are entitled to great weight.  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (*See, e.g.*, Cohen, 964 F.2d at 528 (*citing King v. Heckler*, 742 F.2d 968, 973 (6th Cir.1984)).  However, the ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."  *Id*.

While the conclusions produced by Dr. Haley probably provided valuable insight into Plaintiff's capabilities, the statement of Plaintiff's employability is not itself determinative of disability.  The ALJ was not bound by Dr. Haley's conclusion particularly if it was not supported by detailed, clinical, diagnostic evidence.

      **d.**      **THE NATURE OF PSYCHOLOGICAL IMPAIRMENTS.**

Plaintiff suggests that the nature of a psychological impairment is based on signs and symptoms.  In this case, the ALJ failed to read the symptoms and signs, instead, disregarding these factors and supplanting them with his own conclusions.

"Symptoms" consist of a claimant's description of his or her alleged impairment.  20 C.F.R.

§ 404.1528(a) (Thomson Reuters 2013).  In contrast, "signs" include "psychological abnormalities which can be observed."  20 C.F.R. § 404.1528(a)-(b) (Thomson Reuters 2013).  Signs must be shown by medically acceptable clinical diagnostic techniques.  20 C.F.R. § 404.1528(b) (Thomson Reuters 2013).  Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception.  20 C.F.R. § 404.1528(b) (Thomson Reuters 2013).  They must also be shown by observable facts that can be medically described and evaluated."  20 C.F.R. § 404.1528(b) (Thomson  Reuters 2013).

The Magistrate does not find any error in the ALJ's application of these regulations.  The ALJ did not disregard the signs or the symptoms.  She did consider Plaintiff's litany of symptoms (Docket No. 13, pp. 18, 19, 20, 21, 22 of 939).  As already noted, the ALJ even considered the psychiatric observations made by Dr. Haley (Docket No. 13, p. 19 of 939).  The ALJ was not bound by these observations because of the paucity of medical data and test results to support Plaintiff's claims.  Stated differently, there is little documentation which supports the presence of Plaintiff's subjective reports and even less documentation to indicate the specific psychological abnormalities suggested by Dr. Haley.

The ALJ could not adopt Dr. Haley's observations and Plaintiff's complaints because neither fully satisfied the social security regulations.  The ALJ did not supplant Dr. Haley's opinion with one of her own; she merely arrived at a different conclusion based on the lack of clinical signs and laboratory findings to support Plaintiff's claims and Dr. Haley's unsupported opinions.

**2.**     **RESIDUAL FUNCTIONAL CAPACITY.**

Plaintiff argues that the ALJ's residual functional capacity fails to consider that she had

moderate difficulties in maintaining concentration, persistence or pace.  Because of this omission, the ALJ's residual functional capacity is not supported by substantial evidence.

      **a.**      THE RESIDUAL FUNCTIONAL CAPACITY STANDARD OF REVIEW.

Residual functional capacity is an assessment of one's remaining capacity for work once his or limitations have been taken into account.  *Webb v. Commissioner of Social Security*, 368 F.3d 629, 632 (6th Cir. 2004) (*citing* 20 C. F.R. § 416.945).  It is an assessment of what a claimant can and cannot do, not what he or she does and does not suffer from.  *Id.*  Under those regulations, the ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an "assessment of [her] residual functional capacity."  *Id.* (*citing* 20 C.F.R. § 416.920(a)(4)(iv)). The VE testifies on the basis of a claimant's "residual functional capacity and ... age, education, and work experience" and assesses whether the claimant "can make an adjustment to other work."  *Id.* (*citing* 20 C.F.R. § 416.920(a)(4)(v)).

The Sixth Circuit has not established a bright line rule regarding the manner in which moderate impairment in concentration, persistence and pace are accounted for in a residual functional capacity determination.  *Frye v. Astrue,* 2012 WL 1831548, *15 (N.D.Ohio,2012).  However, in *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.2001), the Sixth Circuit rejected the argument that an ALJ—who had found that a claimant often had problems concentrating—was logically compelled to include that finding (i.e., problem with concentration) in a hypothetical question.  *Id.*  Further, the *Smith* Court did not endorse a mechanical rule by which a mental residual functional capacity determination could be constructed out of particular limitations that might be associated with an impairment of concentration.  *Id.*  The Court simply acknowledged that whether, and to what extent, recognition of impaired concentration would affect or influence a mental residual functional capacity

determination would, ultimately, depend on the evidence in the particular case. *Id.* Different claimants with differing degrees of problems with concentration may have different (i.e., greater or, perhaps, lesser) restrictions, which could be described in varying ways in the context of a RFC assessment. Id.

According to Social Security regulations, concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. *Scott v. Commissioner of Social Security,* 2013 WL 237296, *15 (N.D.Ohio,2013) (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (Thomson Reuters 2013)). Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. *Id.* (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00). In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. *Id.* (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00). Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence. *Id.* (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00).

Determination of these functional limitations is a complex and highly individualized process that requires the consideration of multiple issues and all relevant evidence. *Id.* (*citing* 20 C.F.R. §§ 404.1520a, 416.920a). The category of concentration, persistence or pace refers to the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Id.* (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00).

      **b.**      THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY FINDING.

At first blush, it appears that the ALJ failed to address this issue. However, when the ALJ's

decision is considered as a whole, the Magistrate rejects Plaintiff's contention that the ALJ failed to consider the moderate limitations that Plaintiff had in the ability to maintain concentration, persistence or pace for four reasons.  First, the ALJ adopted the findings that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace when determining if any of her impairments equaled the Listing (Docket No. 13, pp. 22-23 of 939).  Second the ALJ's residual functional capacity assessment can be read to equate the performance of unskilled work with moderate limitations in concentration, persistence, and pace.  Third, there is no evidence that Plaintiff's ability to concentrate is not limited more than is specified in the ALJ's finding of residual functional capacity.  Fourth the ALJ's ultimate determination of jobs that Plaintiff can perform implicitly incorporated a potential for simple, routine instructions and tasks that are consistent with moderate deficiencies in concentration, persistence and pace.

The Magistrate does not reverse this finding because the ALJ's decision adequately considered Plaintiff's actual residual functional capacity.

### VIII.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**


                                                      /s/ Vernelis K. Armstrong
                                                      United States Magistrate Judge


Date:  February 28, 2013

31